PEOPLE v FIELDS

Docket No. 99806. Argued April 4, 1995 (Calendar No. 7). Decided
    August 22, 1995.
    Carl Fields was convicted by a jury in the Calhoun Circuit Court,
    Conrad J. Sindt, J., of assault with intent to murder and
    possession of a firearm during the commission of a felony. The
    Court of Appeals, D. E. HOLBROOK, JR., P.J., and REILLY and
    G. W. HOOD, JJ., reversed in an unpublished opinion per cu-
    riam, and remanded the case for a new trial, finding that the
    prosecutor had shifted the burden of proof to the defendant by
    allowing the jury to draw improper adverse inferences from the
    defendant's failure to produce the woman he alleged actually
    had committed the assault (Docket No. 152485). The people
    appeal.
    In a unanimous opinion by Justice BOYLE, the Supreme Court
    held:
    There is no basis for the conclusion that the prosecutor's
    questions and comments shifted the burden of proof to the
    defendant.
    1. The prosecutor's questions and comments were directed
    toward impeaching the defense version of the shooting by
    focusing the jury's attention on the defendant's failure to
    search for the alleged assailant beyond notifying the prosecutor
    that she existed and asking the prosecution to locate her.
    Arguing that a witness or evidence does not exist attacks the
    credibility of the theory presented. It is not a request that the
    jury infer that an absent witness' testimony would have been
    unfavorable to the defendant. Arguments regarding the weight
    and credibility of the witnesses and evidence presented by the
    defendant do not shift the burden to the defendant to prove
    innocence, but rather question the reliability of the testimony
    and evidence presented.
    2. A defendant in a criminal case has a constitutional right
    against compelled self-incrimination and may elect to rely on
    the presumption of innocence. To effectuate this right, no
    reference or comment may be made regarding defendant's
    failure to testify. Moreover, because only the privilege against
    compelled self-incrimination is protected, fair comment does

not violate the Fifth Amendment right. Because the defendant testified at trial, the prosecutor's comments did not, and could not, impinge on his Fifth Amendment right not to testify. The defendant did not elect to rely on the presumption of innocence, but, rather, testified in great detail how his wife was shot.

3. Prosecutorial comment that infringes on a defendant's right not to testify may constitute error. However, where a defendant testifies at trial or advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant. Although a defendant has no burden to produce any evidence, once evidence or a theory is advanced, argument regarding the inferences created does not shift the burden of proof. The nature and type of comment allowed is dictated by the defense asserted and the defendant's decision regarding whether to testify. When a defendant makes an issue legally relevant, the prosecutor may comment on the improbability of the theory or evidence. In this case, the prosecutor's comments were proper; they did not require an improper adverse inference, infringe on the defendant's Fifth Amendment right, or shift the burden of proof. The prosecutor's cross-examination was directed to the weaknesses inherent in the defense theory. The factfinder was asked to assess the existing evidence in light of the efforts that were not taken by the defendant, not on the defendant's failure to produce evidence. The comments were entirely appropriate and simply illustrated the incredulity of the proffered defense.

Reversed and remanded.

*People v Foster,* 175 Mich App 311; 437 NW2d 395 (1989), disapproved.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Jon Sahli,* Prosecuting Attorney, and *J. B. Jenkins,* Assistant Prosecuting Attorney, for the people.

*Patricia S. Slomski* for the defendant.

Amicus Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Donald Martin* and

*John D. O'Hair,* Prosecuting Attorneys, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the Prosecuting Attorneys Association of Michigan.

BOYLE, J. In this case we address the propriety of a prosecutor's questions and closing argument directed to defendant's efforts to produce the woman who defendant testified had actually committed the assault against his wife for which defendant was charged and ultimately convicted. Finding no basis for the conclusion that the prosecutor's questions and comments "shifted the burden of proof" to the defendant, we reverse the Court of Appeals decision and remand the case for consideration of the issues not addressed in the original appellate decision.

I

During the early morning hours of June 30, 1991, Battle Creek police officers responded to a call and went to the home of defendant's wife, Ola Fields. When the officers arrived, they found Ms. Fields suffering from four nonfatal gunshot wounds: one to the right temple, one to the back of her head, one to her right shoulder, and one to her right wrist. She was alert and angrily explained that she and her husband were separated and that he had shot her because she would not allow him to move back into her house.

Ms. Fields told the officers she was sitting in the bathroom when defendant suddenly appeared in the doorway and began firing at her. He shot her three times in the bathroom and once as she fled into the living room. The police verified that there were blood splatters in the bathroom and a trail of blood drops through the living room proceeding to

the house next door where Ms. Fields fled with her children.

Defendant was arrested about twenty minutes later in downtown Battle Creek. At the time of the arrest, police found a .22 caliber revolver with five spent cartridges in his pocket. Defendant volunteered to the arresting officer that he had shot his wife and that he hoped she was dead. He made a similar statement to the officer who transported him to the police station, and again to the corrections officer who inventoried his possessions. When he was later questioned by an investigating detective, defendant claimed the shooting resulted from an argument he was having with his wife over the paternity of their nine-month-old daughter. Defendant alleged that during the argument, his wife had retrieved a .22 caliber pistol that her father had given her and tried to shoot him.[1] Defendant claimed he was able to take the pistol from his wife, fired at her several times, and hoped "the bitch was dead."

Three and one-half months after the shooting, the prosecutor received an affidavit from Ola Fields and a letter and affidavit from defendant; both affidavits claimed that the shooter was not defendant but was actually Joanne Walker, a woman with whom defendant was allegedly having an affair. Defendant's letter to the prosecutor gave a Detroit address for Joanne Walker and asked the prosecutor to arrest her to clear his name.[2] The affidavits stated that Walker appeared at the door of Ms. Fields' home on the evening of the shooting to talk to defendant, that an argument ensued between Walker and Ms. Fields, and that Walker

[1] During the trial, Ms. Fields' father denied ever giving his daughter a pistol.

[2] During the trial, the investigating officer testified that he was unable to locate "Joanne Walker" or her whereabouts.

pulled out a pistol and fired several shots at Ms. Fields. Defendant claimed he was able to wrestle the pistol away from Walker, who fled, and that Ms. Fields then began accusing defendant of responsibility for the shooting because his affair with Walker had brought her to the house. Defendant claims to have left the house at that point and headed toward the police station to explain what had just transpired. He walked past the station, however, because he was not sure what he wanted to report. It was at that point that he was arrested. Defendant claims he decided to take the blame for the shooting because he did not want Walker, who was pregnant with his child, to go to jail.

At trial, Ola Fields recanted the statements made to the police officers at the time of shooting identifying defendant as the shooter, and testified consistent with her affidavit[3] that the shooter was actually Joanne Walker.

Defendant took the stand at trial, gave testimony consistent with his affidavit and letter, and recanted or denied the various statements he made following his arrest. Defendant testified that he had been having an affair with Joanne Walker for approximately six months before the shooting. He stated that he had been to Ms. Walker's Detroit apartment on one occasion and that he had seen her once or twice a week when she came to Battle Creek to visit some friends. Defendant testified that on the day before the shooting, he was supposed to meet Walker but did not, and that on the night of the shooting Walker appeared at Ms. Fields' home. According to defendant, when his wife asked Walker to leave, an argument ensued during which Walker pulled out a pistol and fired

[3] Neither the defendant's nor Ola Field's affidavit was introduced as evidence at trial.

several quick shots before defendant could wrest the gun from her.

A longtime friend of defendant testified on his behalf and stated that a month or two before the shooting, he had encountered defendant in the area of a local food store. The defendant was driving his car and was accompanied by a woman the defendant introduced as Joanne Walker.

The existence of Joanne Walker was a critical issue at trial. Moreover, because defendant and his wife both testified that they had sent affidavits to the prosecutor asserting Walker's culpability and asking him to arrest her, a subtext of this issue had been introduced in the form of an inference that the prosecutor's failure to follow up on Walker's whereabouts suggested either indifference to the question of the real culprit or a vindictive prosecution.[4]

During the cross-examination of defendant, the prosecutor twice sought to determine what attempts defendant made to locate Walker.[5] Defen-

---

[4] Ms. Fields testified on direct examination that she did not know why the police would let Walker get away with shooting someone.

> Q. [By Mr. Jenkins]: Have you seen her since?
> A. Nope.
> Q. Have you looked for her since?
> A. No. And I don't know why you haven't, or nobody else haven't. Let somebody get away with shooting somebody like that.

[5] Defendant concluded his direct examination testimony with reference to his letter to the prosecutor stating that he had given a false police report. Defendant sought to explain his wife's change of position by stating that when she found out about the false police report "she was willing to come and tell the truth." The pertinent portion of defendant's cross-examination by the prosecutor, Mr. Jenkins, is as follows:

> Q. How often have you followed up on the whereabouts of Joanne Walker?
> Ms. Mladenoff [the defense counsel]: Your Honor, I am going

to object. He's testified until two days ago he was in jail continuously.

*The Court:* Well, I think it's still proper cross-examination. Go ahead.

*By Mr. Jenkins:*

*Q.* How often have you attempted to locate Joanne Walker?

*A.* Well, I put my brother aware of the fact that if she came to town, or if he seen her or could find out her whereabouts too.

*Q.* I don't want you to tell me what your brother said, but as a result of his investigations, did you ever find out where Joanne Walker was?

*Ms. Mladenoff:* Your Honor, I guess I am going to object. He's shifting—basically shifting the burden in this particular case.

*The Court:* Well, I don't think it constitutes shifting the burden. I think its proper cross-examination. Go ahead.

*Q.* [*By Mr. Jenkins*] [*Redirect examination by the prosecutor*]: Did you understand my question?

*A.* Would you repeat it?

*Q.* Did you ever discover, or did your brother ever discover the whereabouts and relate those whereabouts to you, of Joanne Walker?

*A.* No, he didn't find her.

\* \* \*

*Q.* Did you ask your wife to help find the location of Joanne Walker?

*A.* What you mean, did I ask her?

*Q.* Go look for her?

*A.* No. I—I—I asked her—I said to explain it to you. I asked her to give you this information.

*Q.* You knew I was the Prosecutor, that I was the person going to present the case against you, didn't you? You told us that earlier.

*A.* Yes.

*Q.* Joanne Walker would have been vital to your defense in this case if she would have been willing to appear, wouldn't she have?

*Ms. Mladenoff:* Your Honor, I guess I am going to object again. He is shifting the burden.

*The Court:* No, I don't agree with that. Overruled.

*By Mr. Jenkins:*

*A.* What was your answer—the question?

*Q.* My question is, you would agree that Joanne Walker would have been vital to your defense, if she could come here and testify, she could clear you, couldn't she?

*A.* Yes.

*Q.* Why didn't you make other efforts but one letter to the Prosecutor's office as to her whereabouts? No, don't look at your attorney. Just answer me the question.

dant suggested that the prosecution should have located her.

In closing arguments, the prosecutor[6] argued

*A.* I am. Your Honor, could I have a word with my attorney, please?

*The Court:* No.

*By Mr Jenkins:*

*A.* Yes, I made other preparations.

*Q.* I'm sorry.

*A.* I made other preparations in trying to find her.

*Q.* You never told the Prosecutor's office about those, did you?

*Ms. Mladenoff:* Your Honor, I am going to object. He doesn't have to tell the Prosecutor's office about it.

*The Court:* That, I will sustain.

*By Mr. Jenkins:*

[*A.*] No, I didn't tell the Prosecutor's office about it. Why should I tell you?

*Q.* Mr. Fields, the Judge has sustained your attorney's objection, and I honor and I would ask you to, and not answer it.

\* \* \*

*Q.* Mr. Fields, isn't it true that Joanne Walker is a complete fictional character that you have asserted to get off the hook and not . . .

*A.* That is not true.

[6] In closing, the prosecutor, Mr. Jenkins, argued:

I can't imagine a stronger case of what the perpetrator intended to do when he shot, or she shot that person twice in the head and in the arm and hand.

By the way, so that there is no confusion, I believe that Joanne Walker is a construction, a figment of the mind asserted to defend . . .

*Ms. Mladenoff:* I am going to object as to the Prosecutor's beliefs.

*Mr. Jenkins:* This belief is based on the evidence.

*The Court:* Overruled.

*Ms. Mladenoff:* Thank you.

*Mr. Jenkins:* As all of my remarks based on the evidence. That this person is constructed to defend against, for Mr. Fields to be defended against his own admissions.

\* \* \*

When she had a chance to reconsent [sic, reconsider?], we don't know what the married life of Mr. and Mrs. Fields was, and you are not to speculate that among that, except what you heard about the alleged Joanne Walker and what you heard Mr. Fields tell you today.

that Joanne Walker did not exist, and defendant[7]

Well, when you're trying to determine if—if I am right when I argue to you that Joanne Walker is a figment, ask yourself this question: Is it reasonable that Carl Fields, for some gallantry about another woman, would come up to a policeman, the first one that puts him in the car, and tells that officer that he shot his wife? Would he tell the book-in officer that?

\* \* \*

First of all, I don't think there was a Joanne Walker. I think the fight was about something else. What the fight was about is immaterial. He shot her.

[7] During her closing argument, defense counsel Ms. Mladenoff commented:

Mr. Jenkins would have you believe that Joanne Walker doesn't exist. And yet Richard Belemor [defendant's old-time friend] came in and said yes, he was introduced to her by Carl Fields sometime in the spring of 1991. He remembers it because Mr. Fields was driving a red and white Thunderbird. And Mr. Fields testified he got that car in March or April of 1991. She exists.

Certainly she was a bone of contention, if nothing else, between Carl Fields and his wife. The Prosecutor made a great deal about the fact that Joanne Walker is not here. My client and his wife both provided Joanne Walker's address to the Prosecutor's office, and that was back in October of 1991.

Officer Parker said he has not been able to find Joanne Walker. Well, I would expect not. I would not expect Joanne Walker to come in here and say, hey, I shot Ola Fields. Take me to jail. That doesn't make any sense.

And as I told you at the beginning, I don't have to prove Mr. Fields is innocent. I didn't have to put Mr. Fields on the stand. I didn't have to call any witnesses at all. I certainly do not have to produce another person, who has every reason in the world to stay in hiding, and that is because she, in fact, is guilty of this offense and not Carl Fields. What if he didn't do it?

\* \* \*

There were only two people here who could testify as to what happened in that house. Ola Fields and Carl Fields. There was a third person, Joanne Walker, who was not available to come into court and testify.

And even if we could find her, [she] would be unlikely to say anything on the stand to incriminate herself. Of the two out of the three people who would have knowledge of what happened, two of them have come and under oath told us that Carl Fields did not do the shooting.

argued that Joanne Walker shot Ola Fields.[8]

The jury found defendant guilty of assault with intent to murder[9] and possession of a firearm during the commission of a felony.[10] The trial judge sentenced him to twenty-five to fifty years' imprisonment for the assault and a consecutive two-year term for the felony-firearm.[11]

In the Court of Appeals, defendant argued

---

[8] In rebuttal argument, the prosecutor responded by commenting:

Now, the defense makes much of the fact that he—Prosecutor—didn't rustle up, go out and find this Joanne Walker. Well, you have heard Officer Parker testify he did investigations and couldn't find her.

You then ask yourself, well you can say to yourself, I agree with the defense counsel's argument that it's unlikely that Joanne Walker would come up here and admit on the witness stand that she shot Ola Fields.

Well, that is not all the evidence that defense could have found. The defense could have found, in fact, found the house where she lived. Brought other witnesses in to say sure, I know a Joanne Walker. I went to school with her. She is my lifelong friend, whatever.

Speaking of lifelong friends, of course, we have Mr. Belemor who says I have known Mr. Fields for 20 or 25 years. He is my good buddy, and yet I saw a woman that he introduced to me as Joanne Walker.

Boy, how convenient that three months before this shooting, he had this ready-built character to take the rap for him today. Who wants to rat on their good friend?

Secondly, how do we know Carl Fields introduced him to anybody, or anybody by the name of Joanne Walker? But to expect the Prosecuting attorney to find a major component of your defense, is that reasonable? Does your common sense and general knowledge tell you that is what a defense, Defendant is relying upon and expect [sic] the Prosecutor . . .

*Ms. Mladenoff:* Again, for the record, I will object to the Prosecutor shifting the burden.

*The Court:* All right. That is recorded but I don't find it objectionable.

[9] MCL 750.83; MSA 28.278.

[10] MCL 750.227b; MSA 28.424(2).

[11] Defendant has a long criminal record consisting of three prior felonies and seven misdemeanors. At sentencing, the trial judge stated that defendant's record indicated that his criminal involvement had escalated as defendant got older and that rehabilitation was not likely.

among other things that the prosecutor impermissibly shifted the burden of proof to the defendant by questioning him about his efforts to produce Joanne Walker and by arguing to the jury that the evidence presented by defendant failed to establish that Joanne Walker existed. The Court of Appeals agreed that the prosecutor "shifted the burden of proof to defendant by allowing the jury to draw improper adverse inferences from defendant's failure to produce Walker" and, in an unpublished opinion per curiam,[12] reversed the trial court's decision and remanded the case for a new trial.[13] The prosecutor appealed and we granted leave. 447 Mich 996 (1994).

The prosecutor contends that the Court of Appeals erred in concluding that the prosecutor's questions and comments regarding the credibility of the defense theory shifted the burden of proof to defendant to prove his innocence. We agree.

II

Arguments involving claims that the prosecutor's questions, argument, or instructions "shifted the burden of proof" often present a confused potpourri of analytically distinct claims.

One theory on which a claim that conduct or instruction has "shifted the burden of proof" is premised, is the body of law partially relied on by defendant and the Court of Appeals[14] dealing with

---

[12] Issued May 18, 1994 (Docket No. 152485).

[13] Having determined that the prosecutor's comments shifted the burden of proof, the Court of Appeals declined to review defendant's additional claims of error.

[14] The Court of Appeals correctly observed that defendant had no duty to produce Walker. However, once defendant testified that Walker was the actual shooter and that he had so advised the prosecutor, defendant's efforts to find the witness were relevant both to the existence of Walker and to defendant's excuse for not finding her.

the propriety of arguments and the instructional inferences that can be drawn from the failure of a witness to testify at trial. As the United States Supreme Court, in *Graves v United States,* 150 US 118, 121; 14 S Ct 40; 37 L Ed 1021 (1893), explained in dictum:

> [I]f a party has it peculiarly within his power to produce [evidence or] witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the [evidence or] testimony, if produced, would be unfavorable.

The Fifth Amendment does not prohibit instructions on otherwise permissible inferences. *Barnes v United States,* 412 US 837; 93 S Ct 2357; 37 L Ed 2d 380 (1973). Thus, the missing witness rule allows comment by counsel and an adverse inference instruction[15] to be given if certain conditions are fulfilled. 2 McCormick, Evidence (4th ed), § 264, pp 184-189. The inference is permissive and comment and instruction is allowed only when the connection between the circumstances of the case and the inference that the evidence would be adverse is so logical that the factfinder is permit-

As the Supreme Court noted long ago in *Caminetti v United States,* 242 US 470, 494; 37 S Ct 192; 61 L Ed 442 (1917):

> [W]here the accused takes the stand in his own behalf and voluntarily testifies for himself . . . he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it.

[15] The missing witness rule is not before us, and we have no occasion to opine about Michigan's version of that rule. Courts in other states have been careful to confine the use of the rule. See Stier, *Revisiting the missing witness inference—Quieting the loud voice from the empty chair,* 44 Md L R 137 (1985).

ted to make that connection, typically when production of the witness is peculiarly within the power of the party against whom the inference of adverse testimony is sought.

We need not address the requirements of the doctrine, however, because that rule is inapplicable to the present case.[16] The prosecutor did not argue and the jury was not instructed that it could find that Walker's testimony would have been adverse to the defense. Rather, the prosecutor's questions and comments were directed toward impeaching the defense version of the shooting by focusing the jury's attention on defendant's failure to search for Walker beyond notifying the prosecutor that she existed and asking the prosecution to locate her. Arguing that a witness or evidence does not exist attacks the credibility of the theory presented. It is not a request that the jury infer that an absent witness' testimony would have been unfavorable to the defendant. There is a significant difference between urging jurors to accept that the absent witness' testimony would have been adverse to the defendant "and asking them to infer from the evidence that a person whose conduct as described would have exonerated the accused from commission of the charged crime was merely a product of the defendant's imagination." *Alston v United States,* 552 A2d 526, 528 (DC App, 1989). Where the prosecutor's argument does not invite the jury to infer that the absent witness' testimony would be unfavorable, the missing witness cases are inapposite. *United States v Martin,* 696 F2d 49 (CA 6, 1983).

Questioning the credibility of the evidence pre-

---

[16] Because this case is distinguishable from the adverse inference cases, we need not address whether Walker was "peculiarly available to the defense," or whether Walker was unavailable as a witness, because she would have claimed her Fifth Amendment privilege against testifying.

sented, however, does not entail the risk associated with the missing witness rule.[17] Arguments regarding the weight and credibility of the witnesses and evidence presented by defendant do not shift the burden to the defendant to prove his innocence, but rather question the reliability of the testimony and evidence presented.

Defendant's reliance on *United States v Pitts,* 286 US App DC 392; 918 F2d 197 (1990), a missing witness case, is therefore misplaced. The question presented in *Pitts,* and the cases cited therein, was whether an "inference of testimony adverse to the accused may be drawn from the absence" of an actual witness who would in all likelihood invoke his Fifth Amendment privilege against self-incrimination if called as a witness. *Id.* at 395. While concluding "that the trial court erred in allowing the missing witness argument and in giving the related instruction," *id.* at 396, the *Pitts* court specifically did "not decide the extent to which a prosecutor, in commenting on the evidence or lack thereof, may suggest that a witness's absence should weigh against the defense in some other way." *Id.* at 395. Where a witness' testimony would be privileged under the Fifth Amendment, the witness is deemed unavailable, and thus the jury may not be instructed or asked to infer that the witness would provide testimony damaging to the defendant. Stated otherwise, the absence of the witness is not relevant to the party's belief in the strength or weight of his evidence. No inference can be drawn because there is no evidentiary basis from which to draw one. By contrast, argument regarding the absence of a witness, who is injected

---

[17] As one commentator has observed, comment without an adverse inference instruction does not penalize counsel for nonproduction of the witness. "[C]ounsel need not call the witness to avoid comment— they need only present evidence to explain their reasons for failing to call the witness." Stier, n 15 *supra* at 172, n 147.

into the case by one of the parties, illustrates the lack of believability of the events in question.[18]

Here, as in *Alston, supra* at 528, "the prosecutor did not argue that the witness, had [s]he been produced, would have testified unfavorably, nor did he argue that the witness was conspicuously absent, leaving the jury to draw their own conclusions." Rather, the prosecutor argued that Joanne Walker did not exist, an inference reasonably drawn from the fact that defendant sought to rely on his request to the prosecutor to arrest Walker, and a legitimate attack on the credibility of the defense theory. His comments were merely an argument that the jury need not believe defendant's version of how Ms. Fields was shot because of the weakness of the effort made to locate her, i.e., asking the prosecutor to do so. Where a defendant's testimony alludes to the possibility that an absent "witness" would exculpate the defendant, the prosecutor is entitled to explore the credibility of such testimony.

A second argument advanced under the umbrella of "burden shifting" is an allegation of improper comment under the Fifth Amendment. A defendant in a criminal case has a constitutional right against compelled self-incrimination and may elect to rely on the "presumption of innocence."[19] US Const, Am V; Const 1963, art 1, § 15. To effectuate this right, no reference or comment may be made regarding defendant's failure to

[18] Of course, because there may be many reasons for a witness' absence, argument that leads the jury too far from the business at hand is within the court's discretion to control.

[19] The "presumption of innocence," however, is actually not a presumption at all, but "[a]lthough the phrase is technically inaccurate and perhaps even misleading in the sense that it suggests that there is some inherent probability that the defendant is innocent, it is a basic component of a fair trial." 2 McCormick, Evidence (4th ed), § 342, p 453.

testify. *Griffin v California,* 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965); MCL 600.2159; MSA 27A.2159.

Because defendant testified at trial, the prosecutor's comments did not, and could not, impinge on defendant's Fifth Amendment right not to testify. Defendant did not elect to rely on the presumption of innocence but, rather, testified in great detail how Ms. Fields was shot. As LaFave and Israel note, "[t]he prohibition upon comment extends no farther than the reach of the Fifth Amendment privilege . . . ." 3 LaFave & Israel, Criminal Procedure, § 23.4, p 30.

In taking the stand, defendant waived his Fifth Amendment rights. If, "after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness," a defendant decides to testify,

> [h]e cannot reasonably claim that the Fifth Amendment gives him not only this choice but . . . an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. [*Brown v United States,* 356 US 148, 155-156; 78 S Ct 622; 2 L Ed 2d 589 (1958).]

"[T]he protective shield of the Fifth Amendment should [not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case." *United States v Hastings,* 461 US 499, 515; 103 S Ct 1974; 76 L Ed 2d 96 (1983) (Stevens, J., concurring).

In general,[20] where a defendant "takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness . . . ." *Brown, supra* at 154. Because defendant elected to testify at trial, the prosecutor's cross-examination and argument did not burden the Fifth Amendment privilege not to testify.

Moreover, since it is well established that *Griffin, supra,* protects only the privilege against compelled self-incrimination, fair comment does not violate the Fifth Amendment, even where the defendant does not take the stand. In *United States v Robinson,* 485 US 25, 30; 108 S Ct 864; 99 L Ed 2d 23 (1988), where the defendant did not testify and his lawyer argued in closing that the government had unfairly denied him the opportunity to explain his side of the story, the Court found "no constitutional error at all" in the prosecutor's statement in rebuttal that the defendant "could have taken the stand and explained it to you . . . ." *Id.* at 29. The Court squarely rejected the claim that any " 'direct' reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in *Griffin.*" *Id.* at 31. Stressing that contextual analysis is the proper approach to such a claim, the Court concluded that the prosecutor's comment was a fair response to an issue raised by the defense:

> "[The] central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence . . . ." To this end it is important that both the defendant and the prosecutor have

---

[20] The impeachment or substantive use of pretrial silence is not in issue here, see 1 McCormick, Evidence (4th ed), § 132, p 485 *et seq.,* nor is impeachment going solely to credibility. MRE 609; *People v Allen,* 429 Mich 558; 420 NW2d 499 (1988).

the opportunity to meet fairly the evidence and arguments of one another. The broad dicta in *Griffin* to the effect that the Fifth Amendment "forbids . . . comment by the prosecution on the accused's silence," must be taken in light of the facts of that case. It is one thing to hold, as we did in *Griffin,* that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence. There may be some "cost" to the defendant in having remained silent in each situation, but we decline to expand *Griffin* to preclude a fair response by the prosecutor in situations such as the present one. [*Id.* at 33-34 (citations omitted).]

Like the comments in *Robinson,* the prosecutor's comments in this case were a "fair response" to defendant's argument that Walker was the shooter.[21]

Our Court of Appeals has addressed on many occasions the claim that prosecutorial comment on the failure of the defendant to call corroborating witnesses "shifted the burden of proof." See *People v Spivey,* 202 Mich App 719; 509 NW2d 908 (1993); *People v Holland,* 179 Mich App 184; 445 NW2d 206 (1989); *People v Shannon,* 88 Mich App 138,

---

[21] Although fact specific in application, the general rule is that the prosecutor may comment as long as such comment does not impermissibly refer to defendant's silence. See 3 LaFave & Israel, *supra,* § 23.4, pp 30-31 and 1991 cum supp, pp 20-21; "[C]ommenting on a defendant's failure to call or ask particular questions of a witness 'does not have the effect of shifting the burden of proof unless it taxes the exercise of the defendant's right not to testify . . . .'" *United States v Kelly,* 991 F2d 1308, 1314 (CA 7, 1993), quoting *United States v Dahdah,* 864 F2d 55, 59 (CA 7, 1988); *United States v Bautista,* 23 F3d 726, 733 (CA 2, 1994). "[I]t is not error to comment on the failure of the defense to produce evidence on a phase of the defense upon which the defendant seeks to rely." *United States v Bright,* 630 F2d 804, 825 (CA 5, 1980).

145; 276 NW2d 546 (1979). These published opinions of the Court of Appeals have consistently held that when a defendant advances an alternate theory or alibi, "the prosecution, by commenting on the nonproduction of corroborating alibi witnesses, is merely pointing out the weakness in defendant's case" and not "improperly shifting the burden of proof to the defendant." *Shannon, supra* at 145.

In *People v Gant,* 48 Mich App 5; 209 NW2d 874 (1973), the Court of Appeals explained why such comment does not shift the burden of proof.

> This approach [comment by the prosecutor on the defendant's failure to call witnesses to support his defense] does not cast the burden upon defendant to prove his innocence since defendant cannot be convicted upon the basis that he failed to affirmatively prove his defense. The circumstantial evidence resulting from defendant's failure to offer evidence and witnesses to support a proffered defense is no substitute for the prosecutor's burden to prove defendant guilty beyond a reasonable doubt. In spite of this failure, defendant cannot be convicted unless the prosecution has carried its burden of proof on every element of the crime charged. While defendant is free to offer to the jury a defense supported only by his testimony, the nonproduction of other evidence, known and available to defendant, provides the jury with yet another fact for use to test his credibility. [*Id.* at 9-10.]

Stated otherwise, if the prosecutor's comments do not burden a defendant's right not to testify, commenting on a defendant's failure to call a witness does not shift the burden of proof. *United States v Dahdah,* 864 F2d 55 (CA 7, 1988).

Nor is such comment violative of due process under another form of the burden shifting argument, which traces its lineage to the constitution's

preclusion of a presumption on an element of the offense that shifts the burden of disproving that element to the defense. *In re Winship,* 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970). A permissive presumption allows, but does not require, the jury to find proof of an element of the crime from proof of a basic fact, and "affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." *Ulster Co Court v Allen,* 442 US 140, 157; 99 S Ct 2213; 60 L Ed 2d 777 (1979). Instructions on mandatory presumptions may shift the burden of production or persuasion, and shifting the burden of proof or persuasion on an element of the crime charged violates due process. *Ulster Co v Allen, supra; Sandstrom v Montana,* 442 US 510; 99 S Ct 2450; 61 L Ed 2d 39 (1979); *Francis v Franklin,* 471 US 307; 105 S Ct 1965; 85 L Ed 2d 344 (1985).

The instant case involves neither a permissive inference about an element of the charge, nor a mandatory presumption that shifts the burden of production or the burden of persuasion on an element of the offense. There is no suggestion that the jury was required to find the elements of the offense from the defendant's failure to advance evidence, nor did the state allocate any burden to the defendant to disprove an element of the offense.[22] "No presumptions—'[g]iven the common definition of "presume" as "to suppose to be true without proof,"' *Sandstrom* [*supra* at 517] (quoting *Webster's New Collegiate Dictionary* [1974])—were ever presented to them." *United States v Gotchis,* 803 F2d 74, 80 (CA 2, 1986).

---

[22] Due process is not offended where the state allocates the burden of persuasion regarding an affirmative defense to the defendant. *Patterson v New York,* 432 US 197; 97 S Ct 2319; 53 L Ed 2d 281 (1977).

Judge Easterbrook's analysis of the imprecision of burden shifting arguments based on prosecutorial comment is typically insightful and merits extensive quotation.

A prosecutor who comments on a defendant's failure to call a witness may mean one of three things: (1) the case stands unrebutted, which influences the weight jurors should give to the evidence; (2) each side can call witnesses, implying that neither side's failure to call a witness supports an adverse inference; (3) the defendants' failure to call the witness supports an inference that the witness would not have supported the defendants' version of events. The defendants, who complain that the prosecutor's comments here "shifted the burden of proof," apparently believe that any of these three meanings is forbidden ground.

Now none of these meanings actually changes the burden; the district judge correctly instructed the jury that the prosecutor bears the burden at all times. An inference is a way to carry the burden, and no more changes it than does damning evidence. The defendants' real complaint is that a given argument may adversely affect the exercise (or value of) a constitutional right, such as the privilege against compulsory self-incrimination. Thus the defendants' arguments about burden-shifting are offshoots of *Griffin v California* . . . . [*United States v Sblendorio,* 830 F2d 1382, 1391 (CA 7, 1987).]

In rejecting the defendant's burden shifting argument, Judge Easterbrook explained:

The defendant's decisions about evidence other than his own testimony do not implicate the privilege [against self-incrimination], and a comment on the defendant's failure to call a witness does not tax the exercise of the privilege. It simply asks the jury to assess the value of the existing evi-

dence in light of the countermeasures that were (or were not) taken. The inferences come from the evidence before the court. . . . Unless the prosecutor or judge implies that the defendant's failure to testify is itself evidence (or a basis for an adverse inference), *Griffin* is inapplicable. [*Id.*][23]

In sum, prosecutorial comment that infringes on a defendant's right not to testify may constitute error. However, where a defendant testifies at trial or advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant. Although a defendant has no burden to produce any evidence, once the defendant advances evidence or a theory, argument on the inferences created does not shift the burden of proof.[24]

Thus, the Court of Appeals has correctly concluded that the prosecutor may comment on the weakness of defendant's alibi, *Spivey* and *Shannon, supra,* and may observe that the evidence against the defendant is "uncontroverted" or "undisputed," *People v Earl,* 299 Mich 579; 300 NW 890 (1941), even if defendant is the only one who could have contradicted the evidence, *People v Cummings,* 139 Mich App 286; 362 NW2d 252 (1984), or has failed to call corroborating witnesses, *People v Jackson,* 108 Mich App 346, 352; 310 NW2d 238 (1981), or proved what it said it

[23] Burden shifting arguments based on a violation of due process, see *Sandstrom v Montana, supra,* were also rejected. See *Sblendorio, supra.* "[T]he prosecutor's statements here could not have created the presumption he posits even in the absence of curative instructions." *United States v Gotchis, supra* at 80.

[24] To the extent that *People v Foster,* 175 Mich App 311, 317; 437 NW2d 395 (1989), held that argument commenting on the defendant's failure to corroborate testimony that the defendant and his wife presented at trial tended "to shift the burden of proof," it is disapproved.

would in its opening statement, *People v White,* 401 Mich 482; 257 NW2d 912 (1977), and that the defendant has failed to "take advantage of available opportunities to pursue matters relevant to his alibi defense." *People v Lyles,* 148 Mich App 583, 593; 385 NW2d 676 (1986).[25]

The nature and type of comment allowed is dictated by the defense asserted, and the defendant's decision regarding whether to testify. When a defense makes an issue legally relevant, the prosecutor is not prohibited from commenting on the improbability of the defendant's theory or evidence.

### III

The prosecutor's comments in this case were proper. His comments did not require an improper adverse inference, did not infringe on defendant's Fifth Amendment right, and did not shift the burden of proof. The state was not absolved from proving each element of the crime beyond a reasonable doubt.[26]

---

[25] Another argument advanced under the "burden shifting" umbrella is that the prosecutor engaged in improper conduct. See *Alston, supra* at 527. This argument turns on the question whether a given comment may constitute a basis for reversal; it does not "shift the burden of proof" to the defendant. The prosecutor's comments on the defense theory are objectionable if there is no logical or legal relevancy between the comment and theory and inferences placed in issue by the defense. Obviously, if the prosecutor in terms stated that the defendant had a burden of proof, the statement would be incorrect as a matter of law. Quaere: Could such conduct rise to the level of error requiring reversal where the jury was properly instructed?

[26] Both the prosecutor in his closing argument and the trial judge in his jury instruction made clear that defendant had no duty to come forth with any evidence and that it was the prosecutor's burden to prove beyond a reasonable doubt that defendant committed the crime. Specifically, the judge instructed the jury, "A reasonable doubt is a fair, honest doubt, growing out of the evidence or lack of evidence. It is not merely an imaginary or a possible doubt, but a doubt based on reason and common sense."

Moreover, it is without dispute that the trial judge in this case

The prosecutor's cross-examination was directed to the weaknesses inherent in the defense theory. The argument presented the factfinder with the logical inference that defendant's and Ms. Fields' testimony that Walker had done the shooting was false. The prosecutor did not suggest that defendant had a duty to produce Walker, nor did he argue that Joanne Walker's testimony would have been adverse to defendant. Rather, the argument asked the factfinder to assess the existing evidence in light of the efforts that were not taken. The prosecutor was not commenting on defendant's failure to produce evidence, but on the evidence defendant did produce—defendant's own testimony.

The prosecutor's argument in this case was not that the defendant had a burden to prove his innocence, but that the testimony of defendant and his wife was not credible because, if Walker did exist, defendant would have made a greater effort to substantiate that fact than sending one letter to the prosecutor's office. Likewise, defendant alluded to friends that Walker would stay with when she came to Battle Creek, yet defendant did not call any of these friends to establish Walker's existence. The prosecutor's comments regarding the absence of these witnesses at trial was entirely appropriate and simply illustrated the incredulity of the proffered defense.

It would be inconsistent to allow comment on the failure of defendant to call a verifiable witness, peculiarly available to the defendant and not called, see *People v Hunter,* 218 Mich 525; 188 NW 346 (1922), but to deny the opportunity to test

properly instructed the jury that neither the prosecutor's questions, *People v Kelly,* 122 Mich App 427, 431; 333 NW2d 68 (1983); CJI2d 2.7, nor his comments during closing argument may be considered as evidence. CJI2d 2.3; CJI2d 2.5.

the likelihood that the alleged witness is a fictional character. More importantly, such an approach would encourage fabrication of missing witnesses because the claim would be immunized from exploration on cross-examination or argument. Where, as here, a defense theory is explicitly advanced by the defendant, the factfinder is to evaluate the reliability of the claim through traditional means.

IV

Defendant chose to offer a defense that was contingent on the credibility of both Ms. Fields and himself. In electing to assert this defense, defendant invited cross-examination and argument by the prosecutor about the validity and weight of the evidence in support of his theory. Finding no error, constitutional or otherwise, we reverse and remand this case to the Court of Appeals to consider the remaining issues not considered in its previous decision.

BRICKLEY, C.J., and LEVIN, CAVANAGH, RILEY, MALLETT, and WEAVER, JJ., concurred with BOYLE, J.